IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVELLOUS AMIR WARRIOR,<br><br>    Plaintiff,<br><br>    v.<br><br>FERNANDO GONZALEZ ET AL.,<br><br>    Defendants. | No. C 08-00677 CRB<br><br>**ORDER GRANTING SUMMARY JUDGMENT** |

       Plaintiff Marvellous Amir Warrior ("Warrior"), a California state prisoner formerly incarcerated at the California Correctional Institution ("CCI"), filed the instant civil rights action under 42 U.S.C. § 1983 in 2008. In his Third Amended Complaint ("TAC"), Warrior sues Defendant Fernando Gonzalez and three unnamed officers for monetary damages, alleging that they singled out Muslim inmates for unclothed visual body cavity searches before and after Ramadan ceremonies in 2007. See TAC (dkt. 55) ¶¶ 9-18. Warrior brings an Equal Protection claim under the Fourteenth Amendment, Establishment Clause and Free Exercise claims under the First Amendment, and a Fourth Amendment claim. See TAC ¶¶ 24-38.

       Defendant Fernando Gonzalez now moves for summary judgment, arguing that the strip searches were reasonably related to a legitimate penological interest, did not promote one religion over another, and were required of all inmates at CCI. See Mot. (dkt. 91) at 13-18. Gonzalez also claims qualified immunity. See id. at 19-21.

The Court GRANTS summary judgment on Warrior's Equal Protection and Establishment Clause claims because he does not offer any admissible evidence that prison officials treated Muslim inmates differently than inmates of other faiths.

The Court also GRANTS summary judgment on Warrior's Fourth Amendment and Free Exercise claims because, even construing the record in Warrior's favor, Gonzalez is entitled to qualified immunity.

## I. BACKGROUND

### A. Procedural Posture

After a dismissal, an appeal, a Ninth Circuit remand to this Court, and several rounds of screening, Warrior filed his TAC on June 24, 2013, with the aid of appointed counsel. Warrior listed only Defendant Fernando Gonzalez and three unnamed officers as defendants in the TAC. On September 12, 2013, Gonzalez filed a motion to dismiss all claims under Rule 12(b)(6). See Mot. to Dismiss (dkt. 68). On November 20, 2013, the Court dismissed Warrior's Religious Land Use and Institutionalized Persons Act claim, but allowed his First, Fourth, and Fourteenth Amendment claims to proceed. See Order re: Mot. to Dismiss (dkt. 72). Gonzalez now moves for summary judgment, so the Court construes the record in Warrior's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B. Factual Background

During the Islamic holy month of Ramadan in 2007, Muslim inmates at CCI were subjected to unclothed visual body cavity searches before they were allowed to attend their religious programming.[1] See Warrior Depo. (dkt. 91-8) 33:6-34:25; Defendant's Statement of Undisputed Facts ("DUF") ¶¶ 18-26. Warrior heard that prison officials subjected inmates of other faiths to less invasive searches than Muslim inmates. Warrior Decl. (dkt. 92-2) ¶ 6.

Warrior believes that, during Ramadan, Muslims are called upon to exercise personal restraint, focus on their faith, and fast from dawn until dusk. See Warrior's Response to DUF ("Resp. DUF") ¶ 16. Warrior left his cell each morning and night during Ramadan to attend ceremonies with other Muslim inmates in the dining hall. See DUF ¶¶ 21-29; Resp.

---

[1] Warrior does not allege that the searches involved physical contact. See TAC ¶¶ 12-13.

2

DUF ¶¶ 21-29. To get there, the inmates crossed several common areas and the outside yard after dark, with CCI's lighting system illuminating their path. See Gonzalez Depo. 12:9-12; Warrior Decl. ¶ 8. Correctional officers conducted visual body cavity searches before and after programming. See DUF ¶¶ 21-29; Resp. DUF ¶¶ 21-29.

Before programming, CCI required Warrior to strip completely naked in his cell and hand his clothing to a correctional officer for inspection. Id. The officer then conducted an unclothed visual body cavity search of Warrior's person. Id. The officer would typically order Warrior to open his mouth and visually inspect Warrior's mouth with a flashlight. Id. The officer would then order Warrior to bend over and spread his buttocks apart, visually inspect Warrior's rectum with a flashlight, and order Warrior to "drop and cough." Id. Warrior then dressed and went to services. Id.; Warrior Depo. at 33:6–34:18.

After programming, Warrior and other inmates were searched again in the dining hall, sometimes waiting naked for their turn. See DUF ¶¶ 21-29; Resp. DUF ¶¶ 21-29. The correctional officer then performed substantially the same search with the aid of a flashlight: Warrior was ordered to open his mouth for a visual inspection, bend and spread his buttocks apart for a rectal inspection, and "drop and cough." See id. On numerous occasions, a female officer provided aerial coverage from an upper level of the dining hall, where she could see inmates line up and fully disrobe. See Warrior Decl. ¶ 7; Resp. DUF ¶ 30. One particular female officer sometimes made sexually suggestive gestures with her rifle while inmates were being strip searched. See id.; Warrior Depo. at 48:7–14; Resp. DUF ¶ 30.

The searches conducted during Ramadan were more intrusive than those typically conducted when inmates left the Facility IVA housing unit to go to the dining hall. See Warrior Decl. ¶¶ 3–6; TAC ¶ 18. During a typical search, inmates were permitted to leave their boxer shorts and undershirts on, briefly lower their boxers, and "drop and cough," in a way that "limited the ability of officers stationed at the table to see [the inmates'] genitals." See id. ¶ 3; see also Warrior Depo. at 56:15–57:20. During Ramadan, CCI personnel conducted fully unclothed visual body cavity searches, see Warrior Decl. ¶ 6, much like they did when any inmate left the unit/dining hall area to receive medical services, TAC ¶ 18.

3

## II. LEGAL STANDARD

The Court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). A dispute is genuine if the admissible evidence on the record "is such that a reasonable jury could return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. Id. at 248–49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). To determine whether a genuine dispute as to any material fact exists, the Court must view the evidence in the light most favorable to the non-moving party, id. at 255, but need not "scour the record in search of a genuine issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted). Rather, it may rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." Keenan, 91 F.3d at 1279.

## III. DISCUSSION

Time and again, the Supreme Court has stressed that prison officials – not the courts – should make "the difficult judgments" about day-to-day prison operations. Turner v. Safley, 482 U.S. 78, 84-85 (1987). And while inmates retain constitutional protections, those rights are necessarily circumscribed in the prison context. Bell v. Wolfish, 441 U.S. 520, 545 (1979). Even when a prison regulation or practice impinges on an inmates's constitutional rights, the regulation will pass constitutional muster so long as it is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89. Those interests include "deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987).

So for Warrior's claims to survive summary judgment, he must demonstrate two things. First, he must show that the unclothed visual body cavity searches before and after Ramadan services were not reasonably related to a valid penological interest. Second, he

4

must also show that clearly established law put any reasonable prison official on notice that the searches fell short of this low bar. See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (describing qualified immunity analysis). On summary judgment, Warrior may rely only on admissible evidence. Orr v. Bank of Ameica, 285 F.3d 764, 774 (9th Cir. 2002).

### A. Establishment Clause & Equal Protection Claims

Warrior alleges that prison officials subjected Muslim inmates – but not those of other faiths – to unclothed visual body cavity searches before and after religious programming. He argues that doing so violated the Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. So long as those inmates were similarly situated, he would probably be right.

But Warrior has only hearsay evidence to support his allegation of disparate treatment.[2] Warrior remained in his cell throughout Ramadan and emerged only to attend nightly religious services. He did not see how prison officials searched non-Muslim inmates. Instead, he claims only that some Jewish and Catholic inmates told him that did not have to undergo unclothed visual body cavity searches to attend religious services. See Warrior Decl. ¶¶ 2, 6; Warrior Depo. at 24:2–30:24. And while Warrior could testify about what he himself saw and experienced, he may not rely on hearsay statements from unnamed inmates to survive summary judgment.[3] Orr v. Bank of Ameica, 285 F.3d 764, 774. Because Warrior does not have any admissible evidence that different faiths were treated differently, the Court GRANTS summary judgment on his Establishment Clause and Equal Protection claims.

### B. Fourth Amendment & Free Exercise Claims

Warrior also alleges that the Ramadan searches were different from his own usual experience. Although "inmates were routinely subjected to visual body cavity strip searches" when they traveled outside the "area containing the inmate cells and [dining] hall," prison

---

[2] It is also hard to argue that Muslim inmates, whose Ramadan services happened before dawn and after sunset, are similarly situated to inmates of other faiths whose services happened during daylight hours. See DUF ¶¶ 31, 39.

[3] In fact, the Court allowed Warrior to file additional declarations to substantiate these claims. See Hr'g Mins. Tr. (dkt. 96) at 2:2-5. Warrior did not file any additional declarations and now must rely on the existing record. See Warrior Notice Re: Supplemental Evidence (dkt. 97).

5

officials usually conducted less-invasive searches when inmates moved about within this area. See TAC ¶ 18. But because the Ramadan services happened in the dining hall, Warrior argues that the more invasive searches were unnecessary and therefore violated his Fourth Amendment right against unreasonable searches and his First Amendment right to religious Free Exercise. TAC ¶ 18, 24-27, 36-38.

Even if that were so, Warrior cannot overcome qualified immunity. The Supreme Court has "repeatedly" told courts "not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011). In an excessive force case, for example, it is not enough to say that the Supreme Court has long held that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm." Mullenix v. Luna, 136 S. Ct. 305, 309 (2015) (per curiam) (citation omitted). The critical question is instead "whether the violative nature of particular conduct is clearly established." Id. Here, Warrior argues that the Court should deny qualified immunity because the Supreme Court has long held that "prison policies that infringe upon constitutionally protected rights must be [reasonably] related to legitimate penological interests." Opp'n at 15. That will not do.

Turner v. Safley, 482 U.S. 78, 89 (1987), directs courts to apply the same test to both Fourth Amendment and Free Exercise claims in the prison context. Any action by a prison that impinges on a constitutional right – under the First Amendment, Fourth Amendment, or otherwise – will be valid so long as it is "reasonably related to legitimate penological interests." Id. at 89. Courts therefore look to "1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence of alternative means of exercising the right that remain open to prison inmates; 3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and 4) the absence of ready alternatives as evidence of the reasonableness of the regulation." Michenfelder v. Sumner, 860 F.2d 328, 331 (9th Cir. 1988). Courts confronted with Fourth Amendment claims must also consider "(1) the scope of the particular intrusion, (2) the

manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted." Byrd v. Maricopa Cty. Sheriff's Dep't, 629 F.3d 1135, 1141 (9th Cir. 2011) (citations omitted).

Doctrinal intricacies aside, the bottom line for qualified immunity here is simple: unclothed visual body cavity searches in prison are almost always "reasonably related to legitimate penological interests" in discovering hidden weapons and contraband. See Michenfelder, 860 F.2d at 336. For example, Bell v. Wolfish, 441 U.S. 520 (1979), allowed a prison to require inmates "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution" because prisons are "fraught with security dangers." See id. at 558-60. Florence v. Bd. of Chosen Freeholders, 132 S. Ct. 1510 (2012), allowed a jail to require arrestees headed to the jail's general population "to remove their clothing" and then "lift [their] genitals, turn around, and cough in a squatting position." Id. at 1513-14. The Court had no problem that the searches occurred "regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history." Id. at 1514. And, most relevant here, Michenfelder v. Sumner, 860 F.2d 328 (9th Cir. 1988), allowed prison officials to conduct strip searches "every time" an inmate left or returned from the high-security unit housing inmate cells, or moved within the unit under escort. Id. at 329-30; see also May v. Baldwin, 109 F.3d 557, 565 (1997). It also held that "exposing unclothed male inmates" to female guards posed no constitutional problem. Michenfelder, 860 F.2d at 329-30.

Against this array of green lights, Warrior has Byrd v. Maricopa Cnty. Sheriff's Dept., 629 F.3d 1135 (9th Cir. 2011). There, a female prison guard frisked a male inmate in his boxer shorts, which required her to move his "penis and scrotum out of the way" and apply pressure to search the surrounding area. Id. at 1137. She then "placed her hand at the bottom of Byrd's buttocks," "ran her hand up to separate the cheeks while applying slight pressure, to search for contraband inside his anus." Id. The Ninth Circuit held that this search was unreasonable under the Fourth Amendment. Id. at 1147. And while other circuits agree that cross-gender body cavity searches are unconstitutional, see id. at 1144-46 (collecting cases),

7

they have little bearing on this case. Warrior complains of non-contact body cavity searches performed by male guards, with some "casual observation" by female guards – searches that courts regularly uphold, see, e.g., Michenfelder, 860 F.2d at 334.[4] And even if Byrd were on-point, the Ninth Circuit decided it in 2011, well after the events at issue here.

In short, a reasonable prison official could arguably have concluded that unclothed visual body cavity searches conducted by male guards every time male inmates left their cells were constitutional – at least in a high security facility like Warrior's. Clearly established law in 2007 under Bell and Michenfelder gave no hint that limiting such searches to when inmates would be out after-hours would transform an otherwise reasonable search into an unreasonable one – however bright the prison's lights, Opp'n at 10, and whatever the disparate impact on inmates whose religious accommodation required "twice traversing multiple common areas and the outside yard" at night, see Gonzalez Depo. 12:9-12. This is all the more true given that Warrior went through the same search to pray that all inmates went through to see a doctor. TAC ¶ 18.[5]

Accordingly, the Court GRANTS summary judgment on Warrior's Fourth Amendment and Free Exercise claims on the basis of qualified immunity. As to both claims, the Court expresses no opinion about whether a constitutional violation occurred. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

---

[4] However deplorable it was for the female guard to make sexually suggestive gestures during these searches, that conduct cannot be attributed to Defendant Gonzalez. See Hydrick v. Hunter, 500 F.3d 978, 988 (9th Cir. 2007). So, even if her actions made otherwise reasonable searches unreasonably "harassing" under the Fourth Amendment, see Michenfelder, 860 F.2d at 332, it makes no difference here.

[5] At bottom, Warrior simply alleges that prison officials used an objectively reasonable search to discriminate against Muslim inmates. But subjective intentions – however nefarious – play "no role" in the Fourth Amendment analysis. Whren v. United States, 517 U.S. 806, 813 (1996). And, whatever their role otherwise, a "naked assertion" of nefarious intent – without more – will not survive a motion to dismiss, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007), let alone summary judgment. That is all Warrior has left. See supra at 5.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Fernando Gonzalez's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: September 27, 2016



CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE